**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 18-cv-21665-GAYLES/OTAZO-REYES**

**LUJERIO CORDERO,**

    **Plaintiff,**

vs.

**TRANSAMERICA ANNUITY
SERVICE CORPORATION, n/k/a
WILTON RE ANNUITY SERVICE
CORPORATION,**

**AND**

**TRANSAMERICA LIFE
INSURANCE COMPANY,**

    **Defendants.**
_____/

## **ORDER**

**THIS CAUSE** comes before the Court on Defendants' Motion to Dismiss the Amended Complaint (the "Motion") [ECF No. 70]. The Court has considered the Motion and the record and is otherwise fully advised. For the reasons that follow, the Motion is granted.

### **BACKGROUND**

Plaintiff Lujerio Cordero was the beneficiary of a structured settlement agreement through which he was to receive monthly payments for 30 years. Defendants Transamerica Annuity Service Corporation ("Transamerica Annuity") and Transamerica Life Insurance Company ("Transamerica Life") (collectively, "Transamerica") owned and serviced the annuity contract from which the payments were made. Cordero subsequently entered into a series of transfer agreements in which he sold all his monthly payment rights to factoring companies in exchange

for reduced lump-sum payments over a period of two years. The issue now is whether he did so knowingly or was a victim of fraud.

## I.     The Injury and Agreement

According to the allegations in the Amended Complaint [ECF No. 60][1], Cordero was a childhood victim of lead contamination. He "suffered lead poisoning from paint in his New York apartment building, causing debilitating and permanent health handicaps, particularly his cognitive capacity." [ECF No. 60 ¶ 12]. His mother sued the landlord company on his behalf. *Id.* ¶ 13. The parties ultimately entered into a structured settlement agreement[2] that gave Cordero monthly payments of $3,183.94 for 30 years from the time he turned 18 (the "Settlement Agreement"). *Id.* As the parties anticipated, Cordero needed those payments as an adult because his cognitive function did not improve: For example, he has not passed the GED exam and has also been unable to secure any employment other than low-paying jobs. *Id.* ¶ 14.

Continental Casualty Company, the landlord's insurer, transferred its payment obligations to Transamerica Annuity in exchange for a release of liability, making Transamerica Annuity the legal owner of the annuity contract at issue. *Id.* ¶ 15. Transamerica Annuity then purchased an annuity contract with Transamerica Life, who serviced the annuity contract to ensure that future payments were made to Cordero. *Id.* ¶ 16.

---

[1] As the Court proceeds on a motion to dismiss, it accepts as true Plaintiff's allegations in his Complaint. *See Brooks v. Blue Cross & Blue Shield of Fla. Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997) ("When reviewing a motion to dismiss, a court must construe the complaint in the light most favorable to the plaintiff and take the factual allegations therein as true.").
[2] A structured settlement is one that provides for a series of payments to be doled out over time, rather than providing a lump sum. *See Singer Asset Fin. Co. v. Tempkins*, 871 So. 2d 915, 916 (Fla. 3d DCA 2004).

2

## II. The Transfers

Over the course of two years, Cordero entered into six structured settlement transfers which permitted him to receive larger allocations of cash immediately. *Id*. ¶¶ 25–32. The transfers required him to sign away his rights to the monthly payments.

A "transfer" for a structured settlement occurs when a factoring company (also known as a structured settlement buyer)[3] purchases all or a portion of a structured settlement in exchange for immediate lump-sum payments. Such transfers in Florida follow a formula set forth in Florida's Structured Settlement Protection Act, Fla. Stat. § 626.99296 ("SSPA"). The SSPA was enacted "to protect recipients of structured settlements who are involved in the process of transferring structured settlement payment rights." *Id*. § (1). The SSPA accomplishes this by requiring a Florida state court to authorize any transfer of a structured settlement or the legal rights to the payments in advance based on written express findings about the transfer's validity. *Id*. § (3)(a). The state court may deny or impose conditions if the proposed transfer would contravene the terms of the structured settlement. *Id*. § (3)(b). While the court must hold a hearing, the beneficiary may be excused from it for "good cause" shown. *Id*. § (4)(c). And the SSPA requires that the beneficiary (or "transferee") indemnify the annuity issuer and the structured settlement obligor (here, Transamerica). *Id*. § (3)(b).

Structured settlement agreements are also governed by their contractual terms, which often include anti-assignment provisions. Anti-assignment provisions typically require the annuity issuer's approval before any transfers may occur. How annuity issuers enforce this language, however, is not necessarily defined by the contract. Cordero's Settlement Agreement contains an

---

[3] A factoring company is a business that purchases all or a portion of a structured settlement in exchange for a lump sum of cash at a small discount.

anti-assignment provision which states that his "payments cannot be accelerated, deferred, increased or decreased . . . nor shall [Cordero] have the power to sell, mortgage, encumber or anticipate same, or any part thereof, by assignment or otherwise." [ECF No. 60 ¶ 18]. Based on this language, Cordero alleges that Transamerica "enjoyed the discretion to stop each and every transfer . . . but chose otherwise." *Id*. ¶ 41.

The first transfer happened when he was 22. *Id*. ¶ 25. Cordero's mother brought him already completed papers to sign, which he did in her presence without a notary. *Id*. These papers said that Cordero had outstanding debts—which Cordero alleges was false, but he lacked the ability to realize that when signing due to his mental incapacity. *Id*. ¶¶ 25–26. Cordero's signature also appears on written waivers of his entitlement to both independent advice and any notice of hearing. *Id*. Cordero was "told only to sign and initial the documents" but not about their ramifications nor that he had a right to independent advice. *Id*. ¶¶ 34–35. Cordero does not allege who told him this. *Id*.

"[T]he documents submitted to the [state] court contained . . . written acknowledgments evidencing Transamerica's agreement" to the transfer. *Id*. ¶ 27. The state court ultimately approved the transfer in a hearing without an appearance by Cordero or anyone acting on his behalf. *Id*. This first transfer went to Alliance Asset Funding, a factoring company, which paid Cordero $50,230.00 in cash in exchange for 120 of the monthly payments of $750.00 that he was owed under the structured settlement agreement—an aggregate value of $90,000.00. *Id*. ¶ 25.

The five other transfers continued in similar form. Each time, Cordero was handed papers that stated the different reasons he needed money immediately, and he signed them. Except in one transfer, the documents were signed without a notary present. *See id*. ¶ 31. A state court then approved the transfer without Cordero's presence at a hearing. *Id*. ¶¶ 31–32. On November 24,

4

2012, the second transfer was completed, entitling Cordero to $15,000.00 cash in exchange for 120 monthly payments of $750.00. *Id*. ¶ 28. On April 2, 2013, the third transfer gave Cordero $50,000.00 in exchange for 180 monthly payments of $650.000, an aggregate amount of $117,000.00. *Id*. ¶ 29. The fourth transfer gave him $70,900.00 in exchange for 174 monthly payments of $750.00, 50 monthly payments of $1,400.00, and 48 monthly payments of $2.150.00—an aggregate amount of $303,700.00. *Id*. ¶ 30. The fifth transfer gave him $60,000.00 in exchange for 240 monthly payments of $800.00—an aggregate amount of $192,00.00. *Id*. ¶ 31. And the sixth and final transfer gave him $22,000.00 cash in exchange for 235 monthly payments of $213.94. *Id*. ¶ 32. Within two years, the money that he was supposed to receive for the rest of his life was gone.

Cordero alleges that the SSPA's loopholes allow factoring companies to prey on individuals with mental disabilities by enticing them to sign away their structured settlements. *Id.* ¶¶ 36–40. Cordero alleges Transamerica purposefully refused to exercise "discretion" to stop the transfers, even though a cursory review of the applications and stipulations would have revealed that the purported rationales for immediate cash needs were nonsensical and that Cordero could not have understood what was happening. *Id*. ¶¶ 39–45. But Transamerica did not conduct such a review and instead approved each transfer to its profit, as Transamerica received a $750 fee each time. *Id*. ¶¶ 23–24. And factoring companies know that the court dockets are too busy to allow for a thorough review of the transfers, virtually ensuring that the transfer will be approved. *Id*. ¶¶ 38–39.

### III. This Litigation

Cordero brings five claims against Transamerica: (1) breach of contract under New York Law, (2) constructive fraud under Florida law, (3) Exploitation of Disabled Adult under Florida's

5

Adult Protective Services Act ("FAPSA"), Fla. Stat. § 415.102, (4) Federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c), and (5) Florida's RICO Act, Fla. Stat. § 895.03. Transamerica filed its Motion to Dismiss the Amended Complaint, which is now ripe for review.

## DISCUSSION

Transamerica's Motion presents both jurisdictional and sufficiency arguments. The Court addresses each in turn.

### I.  *Rooker-Feldman*

Transamerica first argues that *Rooker-Feldman* bars relief because a judgment in Cordero's favor would mean overturning the state court-approved transfers. Cordero counters that state court approval of an agreement between two parties is not the same as a final judgment from litigation. The Second Circuit recently recognized as much in a case involving a settlement agreement. *See Cho v. City of New York*, 910 F.3d 639, 647 (2d Cir. 2018) (holding that suit "alleging harm flowing from wrongful conduct leading to settlement terms" could proceed because it did not "argue that the state courts committed any error in so-ordering the parties' agreements").

"The *Rooker-Feldman* doctrine makes clear that federal district courts cannot review state court final judgments because that task is reserved for state appellate courts or, as a last resort, the United States Supreme Court." *Casale v. Tillman*, 558 F.3d 1258, 1260 (11th Cir. 2009) (per curiam). The doctrine, named for *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923), and *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983), "is confined to cases of the kind from which the doctrine acquired its name: cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Exxon Mobil Corp. v. Saudi*

*Basic Indus. Corp.*, 544 U.S. 280, 284 (2005). "*Rooker* and *Feldman* exhibit the limited circumstances in which [the Supreme Court's] appellate jurisdiction over state-court judgments precludes a United States district court from exercising subject-matter jurisdiction in an action it would otherwise be empowered to adjudicate under a congressional grant of authority." *Id.* at 291 (internal citation omitted).

The Court agrees that a lawsuit asserting wrongful conduct that led to a state-court approved transfer—as opposed to a lawsuit challenging the state court's judgment in approving the transfer—does not implicate *Rooker-Feldman*. *See Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 75–76 (2d Cir. 2015) (noting that *Rooker-Feldman* did not apply to suit that plausibly challenged defendants' course of conduct in pursuing allegedly unlawful default judgment that state court ultimately entered against plaintiff). Here, Cordero's claim plausibly challenges Transamerica's course of conduct related to the approval of the transfers, which he alleges amounts to fraud. He does not challenge the propriety of the state court final orders that authorized them. Accordingly, his claims are not barred by *Rooker-Feldman*. *See Cho*, 910 F.3d at 647.

## II.  12(b)(6) Issues

### *Legal Standard*

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Although this pleading standard "does not require 'detailed factual allegations,' . . . it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (alteration added) (quoting *Twombly*, 550 U.S. at 555).

7

Pleadings must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citation omitted). Indeed, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal*, 556 U.S. at 679 (citing *Twombly*, 550 U.S. at 556). To meet this "plausibility standard," a plaintiff must "plead[ ] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (alteration added) (citing *Twombly*, 550 U.S. at 556). When reviewing a motion to dismiss, a court must construe the complaint in the light most favorable to the plaintiff and take the factual allegations therein as true. *See Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997).

*Analysis*

Transamerica attacks each of Cordero's claims as inadequately pled. The Court addresses each in turn.

### A. Breach of Contract

Cordero's first claim is for breach of contract under New York law. Cordero must allege "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." *Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996).

Cordero argues that Transamerica breached the annuity contract by executing the anti-assignment provision in a way that it knew would injure Cordero, namely allowing the transfers to proceed without any investigation or other protection. This, Cordero alleges, violated the implied duty of good faith and fair dealing that inheres in every contract and required Transamerica to execute the anti-assignment provision to his benefit. Transamerica counters that the annuity

8

contract confers discretion on whether and how Transamerica should enforce the anti-assignment provision of the Settlement Agreement.

Although the covenant of good faith and fair dealing exists to ensure that contracts are performed in good faith, it does not permit imposing additional obligations on parties or "creat[ing] independent contractual rights." *See Lehman Bros. Int'l (Europe) v. AG Fin. Prod., Inc.*, No. 653284/2011, 2013 WL 1092888, at *2–3 (N.Y. Sup. Ct. March 12, 2013) (quoting *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Xerox Corp.,* 25 A.D. 3d 309, 310 (N.Y. App. Div. 2006), *appeal dismissed*, 7 N.Y. 3d 886 (dismissing claim for breach of good faith where defendant acted in accordance with the contract, allegations did not establish a "fraudulent or malevolent scheme to deprive [plaintiff] of the benefits of the contract," and holding otherwise would impose additional obligations on defendant). "No obligation can be implied . . . which would be inconsistent with other terms of the contractual relationship." *Id.* (quoting *Murphy v Am. Home Products Corp.*, 58 N.Y. 2d 293, 304 (N.Y. 1983)). And claims alleging that defendants executed their "discretion" in bad faith only survive a motion to dismiss where plaintiffs can point to arbitrary, irrational, or malicious execution of defendants' affirmative contractual obligations. *See, e.g.*, *id*.

For these reasons, no case in New York has allowed the covenant of good faith and fair dealing to redefine or otherwise expand an annuity issuer's contractual obligations through the anti-assignment provision. Indeed, New York law protects annuity issuers as anti-assignment provisions are for their benefit. *See Singer Asset Fin. Co. v. Wyner,* 156 N.H. 468, 474–76 (2007) ("Singer fails to recognize that the anti-assignment clause in Wyner's settlement agreement explicitly inured to the benefit of the settling insurer and, by extension, [the annuity issuer]."). While *courts* may take the extra step to determine whether a proposed transfer is in a beneficiary's best interest (and indeed, in Florida, courts are required to do so), the Court has not identified any

case requiring an annuity issuer to do so on its own initiative. For this reason, Cordero's citation to *In re 321 Henderson Receivables Origination, LLC*, is inapposite: In that case, the state court rejected a proposed transfer agreement despite the annuity issuer's consent where no evidence existed that it was in the beneficiary's best interest. 856 N.Y.S. 2d 817, 817 (N.Y. Sup. Ct. 2008). But the court did not suggest that it was the annuity issuer's obligation to have investigated the transfer first. *Id.* (noting instead that an annuity issuer must affirmatively waive its interest in order for a transfer to proceed). And this is because doing so would create an additional contractual obligation on the annuity issuer.

Cordero alleges that Transamerica had a duty of good faith and fair dealing "to enforce the anti-assignment provision for [Cordero's] benefit," that it "breached [that duty], . . . and did so for its own convenience and financial gain in stark derogation of [Cordero's] interests[.]" [ECF No. 60 ¶¶ 49–50]. But this fails because the anti-assignment provision did not require Transamerica to exercise its discretion for Cordero's benefit; it exists to protect Transamerica. And requiring Transamerica to analyze each proposed transfer would create new duties not required by the Settlement Agreement, which the duty of good faith and fair dealing does not allow. Cordero is therefore left with his allegations that Transamerica exercised its discretion poorly. *Id.* ¶¶ 41, 44. But this does not amount to a "malevolent" execution of Transamerica's affirmative contractual requirements, as New York law requires for claims of breach of the duty of good faith.

Accordingly, Cordero has not stated a breach of contract claim upon which relief can be granted, and Count I must be dismissed.

### B. Constructive Fraud and Violation of the FAPSA

Transamerica next argues that Cordero has not sufficiently pled a claim for constructive fraud or violation of the FAPSA, Fla. Stat. § 415.102.

10

### 1. Economic Loss Rule

As an initial matter, the Court agrees that Cordero's constructive fraud claim is precluded by Florida's economic loss rule. "[T]he economic loss rule is a judicially created doctrine that sets forth the circumstances under which a tort action is prohibited if the only damages suffered are economic losses." *Tiara Condo. Ass'n v. Marsh & McLennan Co.*, 110 So. 3d 399, 401 (Fla. 2013). The rule preserves "the fundamental boundary between contract law, which is designed to enforce the expectancy interests of the parties, and tort law, which imposes a duty of reasonable care and thereby encourages citizens to avoid causing physical harm to others." *Id.* (quoting *Casa Clara Condo. Ass'n, Inc. v. Charley Toppino & Sons, Inc.*, 620 So. 2d 1244, 1246 (Fla. 1993)). Cordero must therefore sufficiently assert an independent basis for his constructive fraud claim unrelated to the breach of contract claim if the tort claim is to survive. *See Intercoastal Realty, Inc. v. Tracy*, 706 F. Supp. 2d 1325, 1333 (S.D. Fla. 2010).

Cordero's Response simply says that Cordero "has alleged an independent basis for Transamerica's breach of fiduciary duty," but points to no support from the Complaint. [ECF No. 74, at 11 n. 9]. The Court agrees that Cordero's constructive fraud allegations are premised entirely on the anti-assignment provision and, thus, do not state an independent claim for relief. *Compare* [ECF No. 70 ¶ 58 ("By . . . doing nothing to investigate his circumstances, [Transamerica] breached their fiduciary duty . . . ."), ¶ 61 ("[Transamerica] abused their fiduciary duty to [Cordero] to act in his best interests by not stopping this transfer.")] *with* [*id.* ¶ 49 ("The [anti-assignment provision] obligated [Transamerica] to enforce the anti-assignment provision for [Cordero's] benefit."), ¶ 52 ("[Transamerica] owned the power to protect [Cordero] from assigning his structured settlement . . . .")]. Accordingly, the constructive fraud claim must be dismissed on that basis alone. *See Saxon Fin. Grp., Inc. v. Rath*, No. 11-80646-CIV, 2012 WL 3278662, at *5 (S.D.

Fla. Aug. 9, 2012) (dismissing constructive fraud claim based on economic loss rule where alleged fraud acts where "virtually identical" to the breach of contract ones).

### 2. Fiduciary Duty Allegations

Cordero also fails to allege a fiduciary relationship with Transamerica as required for his constructive fraud and FAPSA claims. [ECF Nos. 70 at 11–13; 74 at 8]. Cordero argues that the fiduciary relationship is implied in the Settlement Agreement, as Cordero was a mentally handicapped adult who could not be responsible for his payments. Transamerica disagrees.

A "fiduciary relationship" is one that "may be implied by law, and such relationships are 'premised upon the specific factual situation surrounding the transaction and the relationship of the parties.'" *Doe v. Evans*, 814 So. 2d 370, 374–75 (Fla. 2002) (quoting *Capital Bank v. MVB, Inc.*, 644 So. 2d 515, 518 (Fla. 3d DCA 1994)). "Florida courts have construed the term 'fiduciary or confidential relation' as being very broad." *Linville v. Ginn Real Estate Co., LLC*, 697 F. Supp. 2d 1302, 1309 (M.D. Fla. 2010). But courts typically do not construe business or "arms length" relationships—such as those created through contract—as implying a fiduciary duty "because there is no duty imposed on either party to protect or benefit the other." *Am. Honda Motor Co. v. Motorcycle Info. Network, Inc.*, 390 F. Supp. 2d 1170, 1179 (M.D. Fla. 2005) (holding no fiduciary relationship was implied in law where no allegations of dependence nor of "recognition, acceptance or undertaking of the duty to advise, counsel, protect, or benefit" the weaker party existed). "[A] party must allege some degree of dependency on one side and some degree of undertaking on the other side to advise, counsel, and protect the weaker party." *Id.*

Here, Cordero has alleged that Transamerica "breached their fiduciary duty" to him and "failed to act in his best interests" "[b]y signing off on each transaction after doing nothing to investigate his circumstances" and allowing his payments to be "stripped away." [ECF No. 60

¶¶ 58, 61]. Nowhere in the Amended Complaint does he allege an affirmative source of this fiduciary duty. He argues instead that it is implied in the Settlement Agreement because Cordero was a mentally handicapped adult who could not be responsible for his payments and Transamerica should have been aware of this. But he does not sufficiently allege dependence on Transamerica or that Transamerica undertook to "advise, counsel, and protect" him. As such, an implied fiduciary duty does not exist here. *See Am. Honda Motor Co.*, 390 F. Supp. 2d at 1179. Accordingly, Cordero's claims under constructive fraud and FAPSA shall be dismissed.

### C. Federal RICO[4]

Cordero charges Transamerica with violating Section 1962(c) of RICO, which targets "those who engage in, or aid and abet another to engage in, a pattern of racketeering activity." "[I]n order to establish a federal civil RICO violation under § 1962(c), [] plaintiffs 'must satisfy four elements of proof: (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.'" *Viridis Corp. v. TCA Glob. Credit Master Fund, LP*, 155 F. Supp. 3d 1344, 1354 (S.D. Fla. 2015) (quoting *Williams v. Mohawk Indust., Inc.*, 465 F.3d 1277, 1282 (11th Cir. 2006)). "A RICO complaint is required to describe the alleged agreement to perform at least two of the predicate acts and must describe *in detail* the conspiracy, including the identity of the co-conspirators, the object of the conspiracy, and the date and substance of the conspiratorial agreement." *Pupke v. McCabe*, No. 13-80860-CIV, 2014 WL 12621479, at *1–2 (S.D. Fla. Jan. 30, 2014) (emphasis added).

---

[4] Florida's RICO case law "is informed by case law interpreting the federal RICO statute." *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1263–64 (11th Cir. 2004) (quoting *Jones v. Childers*, 18 F.3d 899, 910 (11th Cir. 1994)). Accordingly, the Court shall consider the claims as one. *Id.* (citing *All Care Nursing Serv., Inc. v. High Tech Staffing Servs., Inc.*, 135 F.3d 740, 745 (11th Cir. 1998)) (noting that the federal RICO analysis is "equally applicable to [the] state RICO claims").

"[C]ivil RICO claims must be pled with greater specificity[] and [] satisfy the requirements of Federal Rule of Civil Procedure 9(b)." *Super Vision Int'l, Inc. v. Mega Int'l Comm. Bank Co., Ltd.*, 534 F. Supp. 2d 1326, 1330 (S.D. Fla. 2008). This means describing the "'who,' the 'when,' the 'where,' and the 'how' of [defendants'] crimes." *Meridian Tr. Co. v. Batista*, No. 17-23051, 2018 WL 4693533, at *8 (S.D. Fla. Sept. 26, 2018), *appeal dismissed sub nom. Meridian Tr. Co. as Tr., Am. Associated Grp., Ltd. v. Batista*, No. 18-14471-A, 2019 WL 339929 (11th Cir. Jan. 16, 2019) (citation omitted) (dismissing RICO claim where plaintiff failed to plead with specificity).

Transamerica moves to dismiss Cordero's RICO claim as inadequately pled under Federal Rule 9(b) or otherwise precluded by law. The Court agrees that Cordero has not met his Rule 9(b) burden here.

### 1. Aiding and Abetting

Transamerica first argues that the Eleventh Circuit does not recognize an aiding and abetting cause of action under the federal RICO statute, citing *Central Bank v. First Interstate Bank*, 511 U.S. 164, 191 (1994). In that case, the Supreme Court held that Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), a statute substantively identical to RICO, does not provide a civil cause of action for aiding and abetting. But the Court agrees with Cordero that the RICO aiding and abetting cause of action survives because of controlling Eleventh Circuit precedent. *See In re Managed Care Litig.*, 135 F. Supp. 2d 1253, 1266–67 (S.D. Fla. 2001) ("It is the duty of this Court to follow controlling Eleventh Circuit precedent unless there is a direct Supreme Court case on the particular issue in question holding to the contrary.").

Transamerica also argues that Cordero's aiding and abetting allegations are insufficient.[5] "To establish liability as an aider and abettor, a plaintiff must show for each predicate act that the defendant was associated with the wrongful conduct, participated in it with the intent to bring it about, and sought by his actions to make it succeed." *In re Sahlen & Assocs., Inc. Sec. Litig.*, 773 F. Supp. 342, 367 (S.D. Fla. 1991). Thus, whether Cordero's aiding and abetting allegations are sufficient depends on whether he has sufficiently alleged the predicate acts. *Id.*

### 2. Predicate Acts

Cordero must allege with particularity that Transamerica "committed a pattern of RICO predicate acts." *Simpson v. Sanderson Farms, Inc.*, 744 F.3d 702, 705 (11th Cir. 2014); *see Viridis*, 155 F. Supp. 3d at 1360–61 (applying Rule 9(b) standard to mail and wire fraud). He alleges that Transamerica used interstate wire communications and the U.S. mail system, two predicate acts under RICO, to perpetrate the fraud. [ECF No. 60 ¶ 79]. But Cordero's only allegation with respect to the predicate acts is that "it was reasonably foreseeable" that they would occur in order to complete the transfers. *Id.* This is not enough. *See Solomon v. Blue Cross and Blue Shield Ass'n*, 574 F. Supp. 2d 1288, 1291–92 (S.D. Fla. 2008) (courts must review RICO claims closely to ensure that they are not "merely conclusory and unsupported by any factual allegations"). Cordero provides no other supporting facts, including, for example, the date of any wire or mail fraud, "what statements or representations were made; the time and place of, or person responsible for, the alleged statements; or how [Cordero] was misled by the alleged statements[.]" *Bryan v.*

---

[5] Transamerica also argues that Cordero's claims are time-barred. *See Maiz v. Virani*, 253 F.3d 641, 676 (11th Cir. 2001) (holding that RICO claims are subject to a four-year statute of limitations and accrue when a plaintiff discovers or should have discovered his injury and that his injury was part of the racketeering). But the Court need not determine whether Cordero's claims are time-barred because Cordero has not pled at least two predicate acts with specificity. *See Pupke v. McCabe*, No. 13-80860-CIV, 2014 WL 12621479, at *1–2 (S.D. Fla. Jan. 30, 2014).

15

*Countrywide Home Loans*, No. 8:08-CV-794-T-23EAJ, 2008 WL 4790660, at *5 (M.D. Fla. Oct. 27, 2008; *compare Virdis*, 155 F. Supp. 3d at 1361 (finding plaintiff's RICO allegations sufficient where he described the manner and means of the predicate acts, including dates and times, with specificity).

Cordero argues (without citation) that this information is in the hands of Transamerica and can only be obtained through discovery. But at least some of these details—for example, regarding any communications between Transamerica and Cordero and how the predicate acts were used in commission of the RICO conspiracy—are available to him.[6] *See Virdis*, 155 F. Supp. 3d at 1361. And Cordero must plead the information within his control. *Craig v. Little Pearls Adoption Agency, Inc.*, No. 8:10-CV-671-T-30TGW, 2010 WL 4259592, at *3 (M.D. Fla. Oct. 25, 2010) (quoting *United States ex rel. Butler v. Magellan Health Servs.*, 74 F. Supp. 2d 1201, 1216 (M.D. Fla. 1999)) (dismissing where plaintiff did not "adequately plead the content of the alleged fraudulent representations and the places where the activity was to have occurred"). Based on Cordero's failure to plead at least two predicate acts with sufficient specificity, both his federal and Florida RICO claims shall be dismissed.

\* \* \*

The remainder of Cordero's RICO allegations are similarly problematic. Cordero has not alleged that Transamerica was a person involved in an enterprise or that an agreement existed between Transamerica and the factoring companies; nor has Cordero sufficiently alleged the existence of a pattern of racketeering. *See, e.g.*, *Viridis*, 155 F. Supp. 3d at 1364. Explaining these

---

[6] The Court notes that Cordero has alleged (though without particularity) that the state court received documents with Transamerica's signature for each of the transfers. [ECF No. 60 ¶ 27]. That allegation alone suggests that Cordero indeed possesses more information than he has alleged about Transamerica's use of U.S. mail to further this conspiracy.

theories in his Response is not the same as alleging them in his Amended Complaint. Without "specific allegations as to each defendant that will fulfill the 'who, what, when, where, and how' pertaining to the underlying fraud[,]" Cordero's allegations will never get past the pleading stage. *Id*. at 1360.

## CONCLUSION

Defendants' Motion to Dismiss [ECF No. 70] shall be granted. All pending motions are denied without prejudice. Plaintiff may file a Second Amended Complaint within fourteen (14) days. Should Plaintiff's Second Amended Complaint state a viable claim for relief, the Court shall issue a new scheduling order taking into account the discovery that has already been completed and current status of the case.

**DONE AND ORDERED** in Chambers at Miami, Florida, this 6th day of April, 2020.

_____
DARRIN P. GAYLES
UNITED STATES DISTRICT JUDGE